IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 20-07 Erie |
| ) | |
| DAVID ANTHONY MADDEN ) | |
| ) | |

MEMORANDUM ORDER

Defendant David Anthony Madden filed a counseled Motion for Revocation of Original Detention Order, and in the Alternative, Motion for Review of Denial of High Risk Individuals Motion for Reconsideration of Bail in Light of COVID-19 Pandemic, and, in the Alternative, Motion for Release Based on Fifth and Fourteenth Amendment Due Process Violations at ECF No. 76. For the reasons below, Defendant's Motion is denied without prejudice.

I.   HISTORY

On February 11, 2020, a federal Grand Jury returned a two (2) count indictment against Defendant David Anthony Madden along with two other co-defendants. (ECF No. 1). Mr. Madden is charged with two counts of possession with intent to distribute methamphetamines. Following a detention hearing on March 11, 2020, Judge Lanzillo issued an opinion and order detaining Mr. Madden pretrial. Judge Lanzillo found that although the statutory presumption of detention was rebutted, no condition or combination of conditions would ensure the safety of the community if Mr. Madden were released. (ECF Nos. 53, 54.)

On March 17, 2020, Defendant filed a motion to reconsider bail in light of the COVID-19 crisis relying on his underlying medical condition of hypertension coupled with obesity. (ECF No. 57.) A new hearing was held on March 25, 2020, and Judge Lanzillo denied the motion, issuing an opinion that emphasized (1) none of the bases for pre-trial detention had changed since Defendant's first detention hearing; (2) Defendant's hypertension was being monitored and treated at the Erie

1

County Prison, which had no positive cases of the virus; and (3) the trip to and from Philadelphia (where Defendant would reside with his family if released) was more fraught with COVID-19 dangers than the prison where he is lodged. (ECF No. 66.)

Before the Court is a motion to review or reconsider both rulings as well as the reiteration that continued pre-trial detention is violative of Mr. Madden's Fifth and Fourteenth Amendment Due Process rights. Defendant also moved the Court to consider a temporary release under § 3142(i), in the alternative. On May 26, 2020, an evidentiary hearing was held by video because the requirements of social distancing were still in place. New evidence included the testimony of an eminent infectious disease specialist, Dr. Amesh Adalja. Dr. Adalja testified[1] generally on conditions in prisons and other confined spaces with close-living groups, and specifically as to Defendant's medical history. Other new testimony was received from the deputy warden in charge of operations at the Erie County Prison (ECP), Michael Holman. Dep. Warden Holman described the present situation at ECP and the efforts to keep the infection from those housed there. The other evidence received and the legal arguments made before Judge Lanzillo remained relatively the same, but with the advantage of additional legal opinions issued in the interim by other federal courts dealing with similar requests spawned by COVID-19.

II.     DISCUSSION

   A. Review of Detention Orders Pursuant to § 3145

      i.     Detention Order of March 11, 2020

Pursuant to 18 U.S.C. § 3145, a magistrate judge's detention order is reviewable by the district judge and may be vacated or amended. Mr. Madden requests that each of the two detention orders be separately reviewed as they "can be weighed differently in each scenario, and the

---

[1] All references to the testimony received during the May 26, 2020 hearing may be found in the official transcript when it is filed by the Court Reporter.

COVID-19 pandemic has the additional consideration of temporary release under the § 3145 'compelling reason' standard." Defendant's Motion, ECF No. 76 at p.3. Although it is unclear precisely how Defendant envisions the review, the Court will be governed by the posture in which each release was sought before Judge Lanzillo and the requirements of 18 U.S.C. § 3142.

The first order was issued following a hearing upon motion for detention made by the Government. After determining that the presumption of § 3142(e)(3) was rebutted by the release plan whereby Mr. Madden would return to the custody of his family and reside with them in Philadelphia on electronic monitoring, Judge Lanzillo ruled that the Government met its burden of proving by clear and convincing evidence that no condition or combination of conditions would reasonably protect the safety of the public if Mr. Madden were released:

> "The factors weighing in favor of detention included the seriousness of the current charges against Madden, the weight of the evidence supporting those charges, his extensive criminal history of drug-related offenses, included charges based on conduct committed while Madden was already facing other drug-related charges, as well as multiple charges of simple assault, terroristic threats, and similar violent crimes. The undersigned also found that the risk presented by Madden's release could not be reasonably mitigated by the custodial arrangements offered by his family members." ECF No. 66 at p. 3.

The Court agrees that the presumption raised by §3142(e)(3) was rebutted by the proffer of Defendant's plan to be released to the custody of his parents and to reside in their home in Philadelphia on electronic monitoring.

After the presumption is rebutted, the burden shifts back to the Movant/Government to prove by clear and convincing evidence that no condition or combination of conditions will ensure the safety of the community if released.[2] The review then becomes a balancing of the factors listed in § 3142(g), and, because these factors were important enough to be listed specifically by Congress

---

[2] The Government agreed at the hearing that it was not attempting to show that Defendant was a flight risk.

in the Act to test the release plan offered by a defendant, the § 3142(g) factors will be given due consideration.

The Court finds that Judge Lanzillo correctly determined that each factor weighed against release: (a) the charges were serious, involving dangerous drugs in dangerous amounts, and were the type of crimes that Congress specifically decided would raise a presumption of pretrial detention under the Bail Reform Act; (b) the weight of the evidence was substantial against Mr. Madden as the methamphetamines were found in his backpack and he admitted he was about to repackage them for his co-defendants to distribute in the Erie area; (c) although in his favor is the fact that Defendant has a supportive family with whom he may reside on electronic monitoring, other considerations of this §3142(g)(3) factor, including Defendant's criminal history of drug convictions and examples of violence, and continuing criminal activity while on release and while residing with family members to whom he would be released, weights this factor in favor of detention as well; and (d) methamphetamine use and distribution is a serious danger to the community. With all four factors weighing against release by clear and convincing evidence, Judge Lanzillo's ruling was correct at the time and is still appropriate after full review.

    ii.       Detention Order of April 6, 2020

The second detention order was issued following a second hearing, which was held upon motion for temporary release by Defendant pursuant to § 3142(i). This section provides that "[t]he judicial officer [who issued the original detention order] may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). In his well-reasoned memorandum opinion, Judge Lanzillo determined:

> "(1) Madden's proposed release plan would itself create risks to the public and not meaningfully mitigate his risk of exposure to the coronavirus, (2) the

4

> ECP appears to be taking reasonable steps to protect the health and safety of detainees such as Madden, (3) reasonable means short of release from detention exist to allow confidential communications between Madden and counsel, and (4) circumstances have not altered [Judge Lanzillo's] earlier finding that no condition or combination of conditions would reasonably assure the safety of the public if Madden were to be released." ECF No. 66 at pp. 1-2.

This ruling is also reviewed pursuant to § 3145.

During the third hearing in the effort to have Mr. Madden released pretrial, the undersigned received expert testimony from Dr. Amesh Adalja. Dr. Adalja is a specialist in infectious diseases, internal medicine and pandemic preparedness, and he is a spokesperson for the Infectious Diseases Society of America – the professional organization of the infectious disease subspecialty physicians. This background provides him with the precise expertise needed for this Court's review.

Dr. Adalja explained that COVID-19 is unlike anything seen before. He explained that it is different than the six previous COVID viruses in that there is no immunity to COVID-19. He testified that although there is some similarity to SARS, COVID-19 is transmitted more easily, and because there is not population immunity, any community is susceptible to infection. Dr. Adalja strongly urged for Mr. Madden's release because (1) risk of contracting COVID-19 is heightened in any congregant society like a prison; and (2) Mr. Madden's history of hypertension, which Dr. Adalja claims is not well-controlled, places him at higher risk to contracting COVID-19 while incarcerated. *See also* Exhibit E to Motion, ECF No. 76-4.

The media has reported widespread COVID-19 in prisons throughout the country. Fortunately, as of the Review Hearing date, there has been no such outbreak in the Erie County Prison where Mr. Madden is being held pretrial. Deputy Warden of Operations Michael Holman, whose task it is to see to it that the inmates remain as safe and infection free as possible, testified that theECP personnel are temperature-checked daily and must be illness-free before being permitted onto the prison site to begin their shifts. As to the inmates, those

housed at the ECP prior to the quarantine were isolated in their cells for over two weeks at the inception of the nationwide stay-at-home orders, and have remained in their cells for most of the days since, eating from trays brought to them for meals. Inmates have remained in the areas (units or pods) of the prison where they spent the two-week quarantine and no new inmates are placed in those areas until they have undergone the two-week separate quarantine phase.

Dep. Warden Holman also testified that new arrivals are placed together in a two-week quarantine in order to keep track of any illness that may arise. To date none has. There have been two instances when a known COVID-19 infected person was placed in the ECP. The first was a woman who refused to observe curfew after her diagnosis. She spent 24 hours in the ECP early in the nationwide quarantine and was then released after agreeing to abide by all curfew requirements during the duration of her infection. The second inmate was an arrestee within the last week with a known diagnosis of the infection. Both inmates were brought into the facility in full PPE and placed in medical isolation, which entails keeping them in a negative air flow room 24 hours a day during the quarantine period.

Holman also testified that they have had enhanced cleaning and sanitizing schedules throughout the prison, inmates are not permitted to "hang out," board games have been removed, and 6-ft. distancing is enforced. Importantly, ten inmates have been tested for COVID-19, with no positive results; fifteen staff members have been tested, with no positive results. During routine temperature checks, any result for an inmate above 99.5 degrees is flagged for medical attention, and any staff result above 100.4 degrees is also flagged. In any given 24-hour period, approximately 100 staff members enter and exit the facility. The inmate population is currently around 410.

Finally, Dep. Warden Holman testified that private video and audio attorney visits began recently, but regular less private video visitation has been in place since earlier in the

quarantine. A few attorneys have visited the prison in person, but the inmate who meets with an attorney in person must endure another two-week quarantine in a specific section and cannot return to the pod on which the inmate was held previously.

An issue with the meals delivered to the inmates to eat in isolation in their cells arises here because Mr. Madden is having difficulty managing his hypertension and is overweight. He complains that he has been given a steady diet of cold sandwiches, which has exacerbated his medical issues. Deputy Warden Holman agreed that this had been the case early on, but that "hot sides" were added thereafter and fully hot meals are to begin being delivered during the first week of June.

Because Dr. Adalja was the first witness, he was not present at the hearing during the testimony of the conditions and operations at the ECP, such that no response was available to the question of whether Mr. Madden's placement at the ECP during the original quarantine and his continuing presence there with those who were kept isolated similarly, put him in a better position than in prisons generally, seeing that no inmate has tested positive for COVID-19.

However, Dr. Adalja did testify to Defendant's medical condition specifically. He testified that he had reviewed Mr. Madden's medical records and that he did not believe Mr. Madden's hypertension was well-controlled. There was some testimony that his medication was inconsistent, both at the ECP because the prison requires co-pay and fees and Mr. Madden did not wish to drain his prison account to pay these, and when he was home prior to his arrest, where his medication regimen was even less consistent. Mr. Madden's father, David Scott, testified that if released to his custody, he would ensure that Defendant took his prescribed medications. Finally, there is some evidence in the record that Defendant is a chronic smoker, which option has been unavailable to him at the ECP and which could exacerbate his hypertension if released.

Defendant presented important testimony from his father, and a proffer from his mother, that he would be housed as safely as possible in his father's home in Philadelphia,[3] with masks and social distancing as required under the current conditions. Mr. Madden's parents also promised to be certain Mr. Madden maintained his medication regimen, ate well and followed the release plan required by the Courts, even if a violation of the plan required a parent to notify the Court placing Defendant back in jail. Mr. Scott agreed to make the approximately 7-hour drive to Erie and back in one day to collect Defendant, and he promised to install a landline in his home so that his son may be more easily monitored by the Probation Office in Philadelphia. He also agreed to ensure that Mr. Madden had the internet availability to meet with his counsel when needed to prepare his defense.

Condensing all of this information and ignoring the speculation of "what could happen" in this ever-changing environment, conditions as they currently exist at both the ECP and Mr. Madden's home (and in between where travel is required), demonstrate that he is as safe as anywhere in the current circumstances, and likely safer than if released. In addition, his attorney may meet with him in secure and private video sessions to prepare his defense. If an in-person meeting becomes available as restrictions lessen, he is in a better position at the ECP to meet with his attorney. All of these factors dictate that no compelling reason exists to release Mr. Madden on a temporary basis to avoid his contracting COVID-19 or to ensure that he is able to properly prepare his defense.

 B. <u>Defendant's Fifth and Fourteenth Amendment Due Process Rights</u>

---

[3] The Court takes Judicial Notice of the fact that Philadelphia remains in the "red zone" as of this date, meaning that it is still experiencing sufficient infection to require overall quarantine and heightened restrictions. Erie, on the other hand, has moved to the "yellow zone" in the past two weeks, which allows for some movement and lessening of restrictions.

Finally, Defendant makes an argument that his Due Process rights guaranteed to him under the fifth and fourteenth amendments to the United States Constitution are being violated by his continuing incarceration pretrial. He argues:

> "The due process rights of the Fifth and Fourteenth Amendments are implicated and violated when pretrial detainees (state and federal) are held in conditions of confinement that subject them to exposure to serious and potentially fatal conditions. Mr. Madden is being currently exposed to serious and potentially fatal conditions related to COVID-19." Motion, ECF No. 76 at p.17.

All that is provided in support of this argument is a citation to a recent decision from the Northern District of Ohio wherein District Judge James S. Gwin ordered emergency habeas relief for a class of prisoners housed at FCI Elkton after a severe COVID-19 outbreak had occurred in the prison population and with staff. *Wilson v. Williams*, --F.Supp.3d--, No.4:20-cv-794, 2020 WL 1940882 (N.D. Ohio April 22, 2020). Judge Gwin's ruling is inapplicable here for several reasons.

First, that case was brought on the civil docket pursuant to the cruel and unusual punishment prohibitions of the eighth amendment to the United States Constitution. Certainly, Mr. Madden has no less rights under the Constitution as a pretrial detainee, and is, unlike the petitioners in *Wilson*, presumed innocent of the underlying criminal charges; nonetheless, even under the standard by which *Wilson* was brought – that prison officials were deliberately indifferent to a serious medical need – the facts are unsupportive. In fact, the testimony received and discussed above demonstrates that the ECP has been most attentive to those housed at its facility generally and to Mr. Madden particularly.

Second, FCI Elkton has had several deaths in the facility and a growing infection rate in its inmates and staff. This is not the case at the ECP, as discussed above.[4]

---

[4] Notably, as of the date of this order, no inmates at FCI Elkton have been released pursuant to an order by Judge Gwin.

Third, the crisis is beginning to abate across the Commonwealth such that lesser restrictions are being put into place in areas surrounding Erie. Unfortunately, conditions in areas that Mr. Scott and Defendant would drive through to take him to Philadelphia, and especially, in Philadelphia where Mr. Madden will live, have not improved. Unlike FCI Elkton, conditions outside the ECP are no better, and may in fact be worse, than those at the facility.

Finally, Mr. Madden has been given every process due him in his three attempts to be released pretrial. He has had three hearings where testimony and other evidence has been received and reviewed. He is provided with his medication and his well-being is consistently monitored. He is able to work with his attorney on his defense and he is being held in an infection-free prison. The Court is convinced that his Constitutional rights remain intact.

AND NOW, this 1st day of June, 2020, in consideration Defendant's Motion for Review of Denial of High Risk Individuals Motion for Reconsideration of Bail in Light of COVID-19 Pandemic, and, in the Alternative, Motion for Release Based on Fifth and Fourteenth Amendment Due Process Violations (ECF No. 76), evidence received at the hearing on motion on May 26, 2020, briefing, arguments and exhibits in support of the motion, and all opposition thereto, it is hereby

ORDERED that said motion is DENIED without prejudice.

*Susan Paradise Baxter*
Susan Paradise Baxter, United States District Judge